**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| **REAL ESTATE BOARD OF NEW YORK, ROYAL REALTY CORP. D/B/A THE DURST ORGANIZATION, and EXTELL DEVELOPMENT,** |
| **Plaintiffs,** |
| **v.** |
| **CITY OF NEW YORK,** |
| **Defendant.** |

---

## COMPLAINT

Plaintiffs Real Estate Board of New York ("REBNY"), Royal Realty Corp. d/b/a The Durst Organization ("Durst"), and Extell Development ("Extell") (collectively, "Plaintiffs"), by and through their undersigned attorneys, Proskauer Rose LLP, for their Complaint against Defendant the City of New York ("City"), hereby allege as follows:

### PRELIMINARY STATEMENT

1.      This suit challenges the City's unlawful efforts to override state labor law by imposing sweeping, City-designed minimum-wage and benefits mandates on private-sector employers.  The City here is not merely touching on state law or operating at its margins.  It is attempting a wholesale local takeover of minimum-wage and benefits legislation—fields that the State of New York (the "State") has occupied for decades and that New York courts have declared off-limits to municipal regulation.

2.      Local Law No. 61 of 2026 (the "Law") requires private security guard employers to comply with City-mandated minimum-wage, time-off, and supplemental-benefit levels that

"meet or exceed" those in New York City public building service contracts—levels substantially higher than the State's minimum-wage and benefits requirements. The Law further imposes burdensome recordkeeping obligations and vests overlapping enforcement authority in the New York City Department of Consumer and Worker Protection (the "Department"), the Corporation Counsel, and private litigants—creating a parallel local-enforcement regime that directly conflicts with the State's exclusive and uniform framework. At the same time, the Law conditions relief from these mandates on an employer's entry into a collective bargaining agreement that satisfies City-set compensation and benefits standards, thereby placing economic pressure on employers to engage in collective bargaining governed by federal law or remain subject to the City's compensation regime. The result is a standalone City compensation-and-benefits-code that private employers must obey or else face substantial civil penalties, liquidated damages, litigation risk, and more.

3.     The legislative history makes the City's overreach obvious and unmistakable. During legislative hearings, the City Council openly dismissed the State's wage-and-hour framework as "inadequate" and cast the bill as a vehicle to raise wages and benefits for private-sector security guards so that "security guards [can get] the benefits and the pay that they deserve." But dissatisfaction with State policy does not authorize the City to enact its own wage-and-benefits regime and intrude into a field preempted by State and federal law.

4.     The resulting enactment is unlawful three times over. *First*, it is preempted by federal labor law because it intrudes into, and substantially interferes with, the collective bargaining process and the balance of economic forces that federal law reserves to employers, employees, and unions. *Second*, it is preempted under the State's labor law, which establishes a comprehensive, uniform, and exclusive statewide regime governing wages, benefits,

recordkeeping, and enforcement—leaving no room for parallel or conflicting municipal mandates. *Third*, it effects an invalid delegation of legislative authority by handing a City official a blank check to set wages and benefits at whatever levels she deems appropriate, subject to no standards, limits, or guiding principles.

5.     Because the City has enacted a law that the State has long forbidden municipalities to impose—and one that intrudes into an area reserved to federal labor law—Plaintiffs seek declaratory and injunctive relief to prevent its enforcement.

## PARTIES

6.     REBNY is a not-for-profit membership association incorporated under the laws of New York and headquartered in New York City.  Founded in 1896, REBNY is the largest and oldest trade association representing New York City's real estate industry.  It has more than 14,000 members, including commercial and residential property owners, developers, brokers, agents, property managers, private security companies, and others.

7.     Durst is a privately held real estate company based in New York City.  Founded in 1915, Durst develops, owns, and operates commercial and residential real estate in New York City. Durst directly employs security guards throughout New York City at its commercial and residential properties, and those employees are represented by labor unions for purposes of collective bargaining.  Durst is also a member of REBNY.

8.     Extell is a privately held real estate company based in New York City.  Founded in 1989, Extell develops, owns, and operates commercial and residential real estate in New York City.  Through contracts with third-party security companies, Extell engages security guards throughout New York City at its development sites and its commercial and residential buildings. Extell is a member of REBNY.

9.     The City is a municipality organized and existing under the laws of New York State.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including federal labor-law preemption principles recognized under the National Labor Relations Act, 29 U.S.C. § 151 *et seq*.

11.     This Court is authorized to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02, and it may exercise supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

**A.  Local Law No. 61 of 2026**

13.     On January 29, 2026, the City enacted the Law, which imposes new wage, time off, benefits, and recordkeeping requirements on "covered security guard employers." (N.Y.C. Admin. Code §§ 20-1601 to -1616 (2026).)  Under the Law, a "covered security guard employer" is defined as "any person who employs one or more covered security guards in New York city[.]"  (*Id.* § 20-1601.)  A "covered security guard" is defined as "any person employed by a covered security guard employer to principally perform one or more of the functions" set forth under State law (*see* N.Y. Gen. Bus. Law § 89-f(6)), and "who is required to have a current and valid registration card" issued in accordance with State law (*see* N.Y. Gen. Bus. Law art. 7-A).  (*Id.*)  No security guard employer is exempt from the Law, except (i) the United States government, (ii) the State, (iii) the Port Authority of New York and New Jersey, and (iv) the City.  (*Id.*)

14.     The Law phases in higher wages and benefits in successive stages over a three-year period.

15.    Beginning January 1, 2027, the Law requires that covered security guard employers pay covered security guards a "minimum wage" that "meet[s] or exceed[s] the wage requirements for private-sector security guards engaged on New York city public building service contracts in excess of $1,500." (*Id.* § 20-1602.)  Under the City's prevailing-wage regime, the New York City Comptroller annually determines the prevailing wage rates for security guards on public building service contracts in excess of $1,500, and those rates are published in the Comptroller's "Building Service Employee Prevailing Wage Schedule."  The 2025–26 schedule establishes wage rates that are uniformly higher than the State's minimum-wage requirements.  (*See* NYC Comptroller, Building Service Employee Prevailing Wage Schedule (2025–26) (effective July 1, 2025–June 30, 2026) (the "Wage Schedule").)[1]

16.    Beginning January 1, 2028, the Law also requires that covered security guard employers provide covered security guards with "minimum paid time off."  (N.Y.C. Admin. Code § 20-1603.)  That mandated benefit, which includes holidays, vacation, and sick leave (*id.* § 20-1601), must similarly "meet or exceed the paid time off benefits required for private sector security guards engaged on New York city public building service contracts in excess of $1,500." (*Id.* § 20-1603.)  Under the City's prevailing-wage regime, the New York City Comptroller annually determines the paid time-off entitlements for security guards on public building service contracts in excess of $1,500, and those entitlements are similarly published in the Comptroller's "Building Service Employee Prevailing Wage Schedule."  The 2025–26 schedule requires paid time-off benefits that exceed the minimum requirements imposed by State law.  (*See* Wage Schedule.)

---

[1] Available at https://comptroller.nyc.gov/wp-content/uploads/documents/BuildingServiceEmployeeSchedule-2025-2026.pdf.

17.     Beginning January 1, 2029, the Law also requires that covered security guard employers pay covered security guards a "minimum supplemental benefit" that "meets or exceeds the supplemental benefits required for private sector security guards engaged on New York city public building service contracts in excess of $1,500." (N.Y.C. Admin. Code § 20-1604.) Under the City's prevailing-wage regime, the New York City Comptroller annually determines the supplemental-benefit package for security guards on public building service contracts in excess of $1,500, and those required benefits are published in the Comptroller's "Prevailing Wage Schedule for Building Service Employees." The 2025–26 schedule similarly mandates supplemental-benefit levels that exceed the minimum benefit requirements imposed by State law.[2] (*See* Wage Schedule.)

18.     The Law grants the Department's commissioner (the "Commissioner") unfettered authority to determine the foregoing minimum wage, time-off, and benefits levels. While an earlier version of the bill purported to rely on a "study"—under which the Department would gather unspecified information, apply unspecified criteria, and generate unspecified compensation standards to determine the minimum wage, time-off, and benefits levels—the enacted law does not contain even those minimal safeguards. Instead, it merely requires the Commissioner to "post" the "applicable" figures on the Department's website by September 1 each year, without specifying how such minimums are to be derived, constrained, or otherwise justified. (N.Y.C. Admin. Code § 20-1605.)

---

[2] The Law further provides that supplemental benefits include "medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, accident insurance, vacation and holiday pay, costs of apprenticeship or other similar programs and other bona fide fringe benefits not otherwise required by federal, state or local law to be provided by a covered security guard employer . . . ." (N.Y.C. Admin. Code § 20-1601.)

19.    In service of this scheme, the Law also imposes significant recordkeeping obligations on covered security guard employers, requiring them to retain records for six years and to make those records—and any other relevant information—available to the Department upon request.  (*Id.* § 20-1607(a).)  The Law authorizes the Department to establish "by rule" a "uniform system of records."  (*Id.*)  A covered security guard employer's failure to maintain, retain, or produce records to the Department upon its request creates a rebuttable presumption that any material fact alleged by the Department in enforcing the law is true.  (*Id.* § 20-1607(b).)

20.    The Law creates multiple layers of overlapping enforcement authority.  First, the Department may enforce the Law directly.  (*Id.* § 20-1610.)  It may receive complaints from covered security guards or "[a]ny person alleging a violation" (*id.* § 20-1610(b)), must investigate those complaints (*id.* § 20-1610(d)), and may adjudicate violations itself or through the City's Office of Administrative Trials and Hearings (*id.* § 20-1610(e)).  The Department may also "open an investigation on its own initiative" (*id.* § 20-1610(c)), and the Commissioner is empowered to order sweeping relief—including compensatory damages, underpayments, interest, and liquidated damages equal to twice the underpaid wages or benefits.  (*Id.* § 20-1611(a)–(b).)  And the Law authorizes civil penalties of $500 for a first violation and up to $1,000 for subsequent violations, imposed on a per-guard, per-instance basis.  (*Id.* § 20-1612.)

21.    Second, the Corporation Counsel can enforce the Law through expansive litigation authority.  (*Id.* §§ 20-1613, 20-1614.)  Under § 20-1613, the Corporation Counsel may initiate "any action or proceeding" in any court of competent jurisdiction that it deems "appropriate or necessary" to correct an alleged violation, including actions to obtain permanent injunctions, compel compliance, or secure any other relief.  (*Id.* § 20-1613.)  Separately, under § 20-1614, the Corporation Counsel may also bring a civil action alleging "pattern or practice of violations" and

is granted investigatory authority in connection with such actions, including the power to issue subpoenas, administer oaths, and examine persons deemed necessary to ascertain relevant facts. (*Id.* § 20-1614(b).)  In such cases, the Corporation Counsel may seek injunctive relief, the full range of remedies available under § 20-1611, and the civil penalties authorized by § 20-1612.  (*Id.* § 20-1614(a)(2).)

22.    Third, security guards may bring their own lawsuits to enforce the Law.  The Law creates a broad private right of action permitting any person alleging a violation to sue for underpayments, liquidated damages, attorney's fees, and all other appropriate relief.  (*Id.* § 20-1615(a)–(b).)

23.    The Law includes a limited and conditional exemption for certain unionized employers.  Under § 20-1616(b), the Law does not apply to security guards covered by a collective bargaining agreement only if both of the following conditions are satisfied: (i) the collective bargaining agreement expressly waives the requirements of the Law, and (ii) the agreement provides for a combination of wages, paid time off, and supplemental benefits that is equal to or greater than the combination of wages, paid time off, and supplemental benefits mandated by the Law.  (*Id.* § 20-1616(b).)

24.    The Law will take effect on July 28, 2026, which is 180 days after the Law's enactment.  (Local Law No. 61 of 2026 § 3.)

**B.  The Legislative History Confirms that the Objective of the Law Was to Set Wages and Benefits.**

25.    The legislative history is replete with evidence that the Law's wage- and benefit-increasing purpose was neither incidental nor tangential, but rather deliberate and overt—precisely the type of objective that New York courts have repeatedly held preempted.

8

26.     For starters, the bill said so.  As introduced, Int. No. 1391 stated on its face that it was intended to establish "compensation standards for security guards."  (N.Y.C. Council, Int. No. 1391 (2025).)

27.     The October 30, 2025 Committee Report reinforced the bill's wage and benefit-setting objective.  (Committee Report of the Governmental Affairs Division, Committee on Consumer and Worker Protection, dated Oct. 30, 2025 (hereinafter, "Committee Report").)  It contained a standalone section titled "Security Guard Wages and Benefits," which analyzed those issues at length—addressing median pay, disparities by race and gender, and differing wage levels for armed guards, unarmed guards, and unarmed guards with more than 36 months of tenure.  (*Id.* at 3–4.)  The Committee Report also identified low wages and wage inequities as problems the bill was intended to solve and cited industry publications recommending "increased wages" for security guards.  (*Id.* at 5–6.)

28.     On October 30, 2025, the New York City Council held a hearing at which the Committee on Consumer and Worker Protection explained the purpose of the legislation and heard testimony from the public and interested stakeholders.  (Oct. 30, 2025 Hr'g.[3])  At every turn, the record made clear that the wage- and benefit-increasing objective was at the core of this legislation. In opening remarks, the Committee framed the bill as a comprehensive effort to reset compensation standards for private-sector security guards, repeatedly emphasizing that existing pay levels were "inadequate" given New York City's "unique threat landscape."  (*Id.* at 1:20.)  The Committee also explained that the legislation would require the Department to "establish and enforce" minimum wages and benefits to ensure that "security guards are getting the benefits, the pay and

---

[3] New York City Council, Committee on Consumer and Worker Protection & Governmental Affairs, Hearing on Int. No. 1391 (Oct. 30, 2025), available at https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1345376&GUID= 4909A2AB-8680-4B19-8E6F-5EA2ED9ECA7C&Options=info%7C&Search=.

the protection that they deserve being on the front lines throughout New York City." (*Id.* at 3:45–58.)  Throughout the hearing, speakers echoed the same theme, urging the Council to adopt the bill precisely to raise wages and benefits for private-sector security guards.  (*Id.*)

29.     But no matter how sincere, the City's views that security guards "deserve" higher compensation—or that local conditions warrant special treatment—do not supply the City with authority it lacks or permit it to depart from statewide labor policy on its own.  When economic or policy conditions warrant different treatment in different parts of the State, it is the State Legislature that decides whether and how to draw those distinctions—and the State Legislature has expressly and repeatedly done so across numerous statutory schemes.  (*See, e.g.,* N.Y. Lab. Law § 652(1) (establishing region-specific minimum wage rates); N.Y. Real Prop. Tax Law § 421-a (creating geographically differentiated tax benefits based on location and affordability requirements); *id.* § 485-x (establishing location and project-specific tax benefits for qualifying residential developments).)

30.     Even worse, the record confirms that the City proceeded with full awareness that the proposed legislation would be an overreach.  The record shows that the City was not merely aware that New York's highest court has—for more than sixty years—prohibited precisely this type of municipal wage-setting for private employers, but openly acknowledged that fact and chose to proceed anyway.  (Oct. 30, 2025 Hr'g at 32:03–38:58.)

31.     During the hearing, the City Council heard testimony addressing "one of the main legal concerns about raising the minimum wage." (*Id.* at 32:03–34:00.)  Critically, that testimony did not contend that the controlling decision of the New York Court of Appeals had been overruled or displaced or was otherwise inapplicable to this specific bill.  (*Id.*)  Rather, it expressly acknowledged that the Court of Appeals has prohibited local minimum-wage mandates of this kind

for more than sixty years, but criticized and dismissed that binding precedent as a "sharply divided 4-3 court of appeals order" and urged the Council to enact the legislation so that the Court of Appeals could revisit it. (*Id.*)

33.    During the hearing, members of the Council agreed with that critique and endorsed that approach. (*E.g., id.* at 38:34–38:58.)  But whether the Council disagrees with controlling Court of Appeals precedent is irrelevant because the judiciary—not the City Council—determines the scope of municipal authority.  And here, that determination has already been made—six decades ago.

### C.  The Law Imposes Concrete Burdens on REBNY's Members, Durst, and Extell.

33.    The Law imposes concrete economic, regulatory, and operational burdens on REBNY's members, including, but not limited to, Durst and Extell.  REBNY's members are owners, managers, and developers of properties throughout New York City that utilize "covered security guards" in their operations, as well as private security companies engaged in the business of employing security guards and providing security guard services throughout New York City. Many REBNY members—including Durst—directly employ "covered security guards" and, therefore, qualify as "covered security guard employers" under the Law.  Other REBNY members—including Extell—procure security services through contracts with private security companies that directly employ security guards.

34.    For REBNY members that directly employ "covered security guards"—including Durst and other developers, owners, and operators of properties, as well as private security companies—the Law applies to them by its terms and regulates them directly.  It mandates City-set minimum wages, paid time off, and supplemental benefits, and therefore increases labor costs and alters the economics of employing security guards in New York City.  The Law also imposes

recordkeeping and ongoing compliance obligations and subjects those employers to investigation, enforcement, penalties, and private litigation for alleged noncompliance.

35.    The Law also imposes concrete and unavoidable economic and operational burdens on REBNY's members that procure security services through contracts with private security companies, including companies that are themselves REBNY members.  By mandating minimum wages, paid time off, and supplemental benefits for private security guards working in New York City, the Law increases the cost of providing private security services because security companies must comply with the Law as a condition of continuing to operate.  As an economic and contractual matter, those members will pass the increased labor costs to their customers—including REBNY's members such as Extell—through higher contract prices and revised contractual terms, while at the same time remaining subject to the Law's recordkeeping obligations, enforcement mechanisms, and risk of civil penalties and private litigation.

36.    The Law also inflicts specific harms on REBNY's members, including, but not limited to, Durst and Extell, by reshaping the economic landscape that Congress left to the free play of economic forces.  By conditioning an exemption on the existence of a collective bargaining agreement that both expressly waives the Law's requirements and satisfies City-set compensation thresholds, the Law establishes a de facto floor and allocation of compensation that operates as a nonnegotiable starting point in bargaining and exerts powerful economic pressure on non-union employers and employees to unionize and conclude agreements simply to avoid the City's regime. In unionized settings, the Law removes subjects from the table by dictating minimum wages, paid time off, and supplemental benefits—and their allocation across those categories—which constrains trade-offs over total compensation, impairs the parties' abilities to deploy economic self-help measures, and artificially tips leverage in negotiations.  In non-union settings, the

immediate and significant cost increases and compliance burdens diminish employers' ability to withstand strikes or other concerted activity and increase the costs of remaining non-union, placing non-union firms at a competitive disadvantage relative to their unionized rivals who can qualify for the exemption. This pressures employees to select union representation and pressures employers to accede to union demands.

37.     These injuries are not speculative and do not depend on discretionary enforcement decisions or uncertain future events. The Law establishes binding compensation, benefits, and compliance mandates on a date certain and immediately and unavoidably alters the bargaining dynamics and the economics of employing and procuring security guard services in New York City. The resulting economic, regulatory, and operational burdens flow directly from the Law itself.

38.     REBNY has associational standing to bring this action on behalf of its members. First, at least one REBNY member has standing to sue in its own right because the Law directly regulates REBNY members that employ union-represented and non-union guards—including private security companies, as well as developers, owners, and operators of New York City properties—and imposes substantial, unavoidable, and unrecoverable economic, regulatory, and operational harms on those members and on other members that procure security services through private security companies. Second, the interests REBNY seeks to protect—ensuring that its members are not subject to unlawful, preempted municipal wage-and-benefit mandates—are germane to REBNY's mission: to support, protect, and advance the business of real estate in New York City, including through advocacy on legislative and regulatory matters affecting its members. Third, neither the claims asserted nor the relief requested requires the participation of individual

members, as this action presents exclusively legal questions appropriate for resolution through declaratory and injunctive relief.[4]

## COUNT ONE
**(National Labor Relations Act Preemption)**

39.    The allegations contained in paragraphs 1–38 above are repeated and realleged as if fully set forth herein.

40.    The National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, preempts state or local laws that interfere with activities in the collective bargaining process that Congress intended to be left unregulated.

41.    The Supreme Court has held that the ability of both employers and employees to apply economic pressure to each other is protected from state and local regulation. *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132 (1976); *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608 (1986).

42.    A local government lacks authority "to attempt to introduce some standard of properly balanced bargaining power . . . or to define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining." *Machinists*, 427 U.S. at 149–50 (citations and internal quotations omitted).

43.    The NLRA prohibits state and local governments from impairing the economic advantages of either negotiating party to the collective bargaining process to tip the scales in favor of either one.

44.    The Law interferes with the processes of unionization and collective bargaining in the private security services industry in New York City by imposing costs and related burdens so

---

[4] Further, in any event, this suit includes two of REBNY's approximately 14,000 members (Durst and Extell).

excessive on non-union employers that, if they do not agree to unionize and enter into a collective bargaining agreement, they will not qualify for the exemption from the Law's coverage (N.Y.C. Admin. Code § 20-1616(b)) and will face severe economic harm to their business and be placed at a substantial competitive disadvantage.

45.     The Law impermissibly interferes with the collective bargaining process between unionized private security service employers and collective bargaining representatives of security guards in New York City by imposing minimum wage and benefit requirements derived from municipal prevailing wage obligations in public-sector service contracts. (*Id.* §§ 20-1601–20-1604.) Pursuant to the Comptroller's Prevailing Wage Law Regulations, the minimum wage and benefit requirements in public-sector service contracts are determined based on private-sector collective bargaining agreements covering the same classifications in New York City. *See* 44 R.C.N.Y. § 2-03(b)(1). Thus, the Law replaces the actual results of bargaining between private-sector employers and their employees with public-sector compensation obligations that are tied dynamically to collective bargaining conducted by other employers and employees. *See Chamber of Commerce of U.S. v. Bragdon*, 64 F.3d 497, 504 (9th Cir. 1995).

46.     The Law further interferes with the collective bargaining process between unionized private employers and their employees by imposing a detailed minimum-compensation scheme expressly divided into three distinct categories: hourly wages, paid time off, and a benefits supplement. This scheme is far more invasive than a single minimum labor standard because it does not merely create a baseline compensation amount to serve as a backdrop for negotiations, but also dictates the division of the overall compensation package that would otherwise be the subject of collective bargaining. *See Bragdon*, 64 F.3d at 502 (finding an express "division of the total package" of hourly compensation paid to workers between wages and several supplemental

benefit categories to be "much more invasive and detailed" with respect to interfering with the collective bargaining process); *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1134 (7th Cir. 2008) ("[W]hen the parties are not free to devise their own arrangement preemption applies because the statute intrudes on the collective bargaining process.").

47.    The Law is not a permissible minimum labor standard.  *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985).   The Law does not affect union and non-union employees equally because it places severe economic pressure and related burdens on non-union security-service employers and gives their unionized competitors with collective bargaining agreements an arbitrary advantage in the market by including an exemption from the requirements of the Law.  (N.Y.C. Admin. Code § 20-1616(b).)  If the employees of a security-service employer are not represented by a labor union and the parties are not subject to a collective bargaining agreement, then the security-service employer faces the higher costs and related burdens of the Law's minimum wage and benefit requirements, the obligatory division of the overall compensation package as set forth in the Law, and increased competitive pressure.   The combination of these various factors may force private, non-union security-service employers to take measures to reduce costs, including, but not limited to, reducing headcount.   Non-union employees fearful of losing their jobs may be pressured to unionize and seek a collective bargaining agreement, even if they would otherwise prefer not to join the union.  By pressuring employers *and* employees to reach collective bargaining agreements, the Law has a direct effect on the interests implicated in the NLRA.

48.    Unlike permissible minimum labor standards, the Law is not a law of general application because it applies to only one occupation in New York City: security guards. Moreover, the Law excludes federal, state, and municipal employers from its coverage *and*

16

exempts virtually all public-sector employees.  (*Id.* §§ 20-1601, 20-1616(a).)  Because the Law expressly applies to only a narrow subset of workers—*i.e.*, private-sector security employees and guards working in New York City who are not subject to a collective bargaining agreement—it is not a state-wide backdrop for collective bargaining and does not have a sufficiently broad application to constitute a permissible minimum labor standard.  *See Shannon*, 549 F.3d at 1134.

49.    The Second Circuit has not yet explicitly decided whether it agrees with *Bragdon* and *Shannon*.  When it has upheld other laws against *Machinists* preemption challenges, however, it distinguished *Bragdon* and *Shannon* on the very grounds shared by the Law here.  *See, e.g.*, *Rest. Law Ctr. v. City of New York*, 90 F.4th 101, 114–15 (2d Cir. 2024) (distinguishing *Bragdon* because the ordinance there "tied wages dynamically to ongoing and future bargaining processes"); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 86 n.8 (2d Cir. 2015) (distinguishing *Bragdon* based on the ordinance's invasive division of the overall compensation package and *Shannon* based on the provision being a "substantially more targeted invasion of the bargaining process").  The precise flaws that the Seventh and Ninth Circuits held warranted *Machinists* preemption also compel preemption of the Law here.

50.    The Law thus intrudes on the NLRA's protected domain by redirecting organizing and bargaining from the NLRB-supervised processes to political fora, substituting the free play of political forces for the free play of economic forces that Congress intended to leave unregulated. Unlike neutral, generally applicable minimum labor standards that neither encourage nor discourage collective bargaining, the Law operates as a targeted measure keyed to collective-bargaining outcomes, placing a thumb on the scale for unionization and legislative leverage rather than preserving federally protected space for organizing campaigns and hard bargaining.  Courts have held that such non-general, occupation- or sector-specific enactments—especially those

pegged to union-negotiated terms or otherwise developed from the bargaining of others—are not true "minimum" standards and are preempted under *Machinists* because they interfere with the bargaining process and channel disputants to legislatures instead of the bargaining table. That is because the NLRA protects process, not outcomes, and permits only minimal, generally applicable state standards that serve as a neutral backdrop for negotiations; when a statute singles out a discrete class of employers or employees and effectively dictates substantive terms, it intrudes on the domain Congress reserved to economic self-help. If the City's overreach is countenanced, it will no doubt invite other politically powerful unions to secure organizing gains through receptive legislatures rather than by winning the hearts and minds of employees—contrary to Congress's intent under the NLRA. *Bragdon*, 64 F.3d at 504 ("This could redirect efforts of employees not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies."); *Shannon*, 549 F.3d at 1133 ("Illinois' approach further allows non-union employees to benefit from the bargaining of the union which took place, not at the bargaining table, but at the legislature.").

51.      Accordingly, by imposing uniquely burdensome mandated terms on non-union employers, steering employees and unions to City Hall rather than to NLRB elections and good-faith bargaining, and unlawfully interfering with the federally-protected collective bargaining rights of REBNY's members, Durst, and Extell, among many others, the Law is incompatible with the NLRA, is preempted, and is unenforceable under the Supremacy Clause of the U.S. Constitution.

## COUNT TWO
### (State-Law Preemption)

52.      The allegations contained in paragraphs 1–51 above are repeated and realleged as if fully set forth herein.

53.    The New York State Constitution, Art. IX, § 2(c), grants local governments the power to adopt and amend local laws not inconsistent with the provisions of the constitution or any general law of the State.  The Municipal Home Rule Law further prohibits local governments from adopting local laws that are inconsistent with, or that supersede, the provisions of the State constitution or any general law of the State.  *See* Mun. Home Rule Law §§ 10 and 11.

54.    More than sixty years ago, New York's highest court held that the City lacks authority to impose minimum wage mandates on private employers because such laws are preempted by State labor law.  *Wholesale Laundry Bd. of Trade, Inc. v. City of New York*, 189 N.E.2d 623 (N.Y. 1963).  In the six decades since, New York courts have repeatedly reaffirmed that the State has preempted the field of wage regulation and have invalidated municipal attempts to impose local wage mandates on private employers.  *See, e.g., Mayor of City of New York v. Council of City of New York*, 2013 N.Y. Slip Op. 31802[U] (Sup. Ct. 2013).

55.    *Wholesale Laundry* rested on two independent grounds.  First, applying principles of conflict preemption, the Court held that a local minimum wage law is invalid where it "forbids a hiring at a wage which the State law permits and so prohibits what the state law allows."  *Wholesale Laundry*, 17 A.D.2d 327, 330 (1st Dep't 1962), *aff'd*, 189 N.E.2d 623 (N.Y. 1963).  Second, applying principles of field preemption, the Court concluded that the State's minimum wage legislation established an "elaborate machinery for the determination of an adequate wage" and therefore "indicate[d] a purpose to occupy the entire field."  *Id.*

56.    Notwithstanding that settled precedent, the City enacted the Law and did exactly what *Wholesale Laundry* forbids: it imposed City-created minimum wage, paid time-off, and supplemental-benefits requirements on private security guard employers.  It did so not on the

ground that *Wholesale Laundry* had been overruled or is otherwise inapplicable to the Law, but rather with full awareness of *Wholesale Laundry's* continuing force.

57.    The Law is therefore invalid under both conflict preemption and field preemption.

58.    Under the doctrine of conflict preemption, a local law is invalid as inconsistent with state law where it conflicts with state law. *Lansdown Ent. Corp. v. N.Y.C. Dep't of Consumer Affs.*, 543 N.E.2d 725, 726–27 (N.Y. 1989). Such a conflict exists where a local law prohibits what state law allows, or allows what state law prohibits. *Wholesale Laundry*, 189 N.E.2d 623.

59.    State law permits employers to pay wages and furnish other benefits in accordance with uniform statewide standards established under Labor Law Articles 6 and 19. *See* N.Y. Lab. Law art. 6 § 190 *et seq.*; art. 19 § 650 *et seq.* By mandating different and additional minimum wages, time off, and benefits levels, the Law prohibits what state law allows and thereby creates a direct conflict.

60.    Under the doctrine of field preemption, a local law is invalid as inconsistent with state law where the state has evinced a desire to preempt an entire field, thereby precluding any further regulation. *Albany Area Builders Ass'n v. Town of Guilderland*, 546 N.E.2d 920, 922 (N.Y. 1989) ("Where the State has preempted the field, a local law regulating the same subject matter is deemed inconsistent with the State's transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute.").

61.    Through Labor Law Articles 6 and 19, the State has created a comprehensive and detailed statutory and regulatory scheme regulating the payment of wages and benefits, including associated recordkeeping and enforcement obligations. *See* N.Y. Lab. Law art. 6 § 190 *et seq.*; art. 19 § 650 *et seq.* The State has also vested the Commissioner of the Department of Labor with expansive authority and discretion to enforce this statewide wage and benefit scheme. N.Y. Lab.

Law § 21; art. 6 § 190 *et seq.*; art. 19, § 650 *et seq*.  Through this extensive framework, the State has evinced a clear intent to preempt the entire field of protection of workers from nonpayment and underpayment of wages and benefits.

62.    By imposing City-created minimum wage, paid time off, and supplemental benefit requirements on covered security guard employers—together with City-specific recordkeeping obligations and a standalone municipal enforcement regime—the Law legislates in a field the State has comprehensively occupied and is therefore invalid under the doctrine of field preemption.

63.    Accordingly, the Law is preempted under both conflict preemption and field preemption and is unenforceable under the New York State Constitution and the Municipal Home Rule Law.

## COUNT THREE
### (Invalid Delegation of Legislative Power)

64.    The allegations contained in paragraphs 1–63 above are repeated and realleged as if fully set forth herein.

65.    The City's government is organized under the City Charter.  Under the City Charter, legislative power is vested in the City Council, and the Council may act only by local law.  *See* N.Y.C. Charter §§ 21, 28, 32.

66.    Although the City Council may authorize City agencies to implement and administer local laws, it may not delegate fundamental policy determinations to agencies without supplying sufficiently concrete standards to cabin agency discretion.  *See, e.g., N.Y. Statewide Coal. of Hisp. Chambers of Com. v. N.Y.C. Dep't of Health & Mental Hygiene*, 16 N.E.3d 538, 545–46 (N.Y. 2014); *Boreali v. Axelrod*, 517 N.E.2d 1350, 1355–56 (N.Y. 1987); *Levine v. Whalen*, 349 N.E.2d 820, 822 (N.Y. 1976) ("The Legislature may constitutionally confer discretion upon an administrative agency only if it . . . provides standards to govern its exercise.").

67.      Here, the Law's delegation to the Commissioner of the authority to determine the applicable wages, paid time off, and supplemental benefit levels is an improper delegation because the Law does not supply meaningful standards to guide the Commissioner's discretion in making those determinations.  Instead, the Law merely requires that the Commissioner "meet or exceed" certain benchmarks set and periodically revised by another City official outside the legislative process, and authorizes the Commissioner to set compensation, time off, and benefits levels at any amount above those benchmarks and then "post" whatever figures the Commissioner selects on the Department's website.  In other words, the Law leaves the Commissioner free to determine—without guidance, limits, criteria, or standards—the compensation and benefits private employers must provide.

68.      By authorizing the Commissioner to establish Citywide minimum wage, time-off, and benefits requirements from whole cloth and without meaningful guidance or standards, the Law delegates to an administrative official the power to define the substance of the City's compensation regime for private employers, rather than merely to implement a legislatively defined policy.  New York law does not permit such open-ended delegation of policy-making authority.

69.      The Law is therefore invalid and unenforceable.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment:

A.      Declaring that the Law is invalid, without force and effect, and that REBNY's members, including Durst and Extell, are not required to abide by its terms;

B.      Preliminarily and permanently enjoining Defendant's implementation and enforcement of the Law;

C.      Awarding Plaintiffs damages, costs, and reasonable attorneys' fees; and

D.    Awarding Plaintiffs such other and further relief as the Court may deem just and proper.


Dated:  February 19, 2026                    Respectfully submitted,

                                             /s/  *Mark D. Harris*

                                             PROSKAUER ROSE LLP
                                             Mark D. Harris
                                             Jacob R. Butwin
                                             Eleven Times Square
                                             New York, NY 10036-8299
                                             212-969-3000
                                             mharris@proskauer.com
                                             jbutwin@proskauer.com